NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 28, 2007
Decided February 25, 2008

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 06-3536 | Appeal from the United States District Court for the |
| UNITED STATES OF AMERICA, | Northern District of Illinois, |
| *Plaintiff-Appellee*, | Eastern Division. |
| v. | |
| | No. 05 CR 389 |
| ROSITSA DIMITROVA, | |
| *Defendant-Appellant*. | **Blanche M. Manning**, |
| | *Judge*. |

**O R D E R**

Rositsa Dimitrova, a native and citizen of Bulgaria, challenges her conviction for marriage fraud under 8 U.S.C. § 1325, arguing that the district court improperly admitted certain statements she made to immigration agents at O'Hare International Airport, which she claims were given without the benefit of the warnings required under *Miranda v. Arizona*, 384 U.S. 436 (1966). In addition, she appeals the district court's denial of her motion for judgment of acquittal, arguing the government failed to present sufficient evidence that she entered into a fraudulent marriage for the purpose of obtaining immigration benefits.

We affirm. Dimitrova did not move before trial to suppress her statements as required by Rule 12(b)(3)(C) of the *Federal Rules of Criminal Procedure;* nor did she show good cause for her failure to do so as required by Rule 12(e) in order to obtain relief from the waiver. Accordingly, under *United States v. Johnson*, 415 F.3d 728 (7th Cir. 2005), Dimitrova has procedurally defaulted even plain-error review of the issue. Moreover, the evidence that Dimitrova knowingly entered into a fraudulent marriage was ample and more than sufficient to

support the guilty verdict.

## I. Background

Dimitrova was admitted to the United States with her parents in 1994. After she turned 18 in 1998, she remained in the United States on a student visa and attended Lake Forest College and Benedictine University. Her student visa was set to expire on August 31, 2001. On August 2, 2001, Dimitrova married George Kates ("Kates"), another Bulgarian immigrant who knew Dimitrova's father and had become a United States citizen on June 5, 2001. Kates worked as a truck driver and had been married in the mid-1990s to another woman, but separated after only one day of marriage. On August 4, 2001, two days after their wedding, Kates and Dimitrova obtained the paperwork to adjust Dimitrova's status based on her marriage to Kates; they filed the completed forms with the Immigration and Naturalization Service ("INS")[1] on August 27, 2001.

In November 2003 Dimitrova and Kates attended an INS interview regarding her adjustment application for the purpose of determining whether the marriage was legitimate or had been entered into to obtain immigration benefits. At the interview they presented statements from a joint bank account, a joint tax return for the year 2002, and utility, credit card, and telephone bills bearing both of their names in an effort to prove they were living together as a married couple. In March 2004 the government approved Dimitrova's application for permanent resident status.

While pursuing another investigation, immigration agents executed a "trash pull" outside of Dimitrova's parents' house and discovered a note that purported to provide Dimitrova guidance for convincing the INS that her marriage to Kates was bona fide.[2] This flagged Dimitrova for investigation, and in January 2005 four immigration agents confronted Dimitrova at the immigration checkpoint at O'Hare International Airport as she returned from a trip to Bulgaria. During questioning at the airport, Dimitrova told the agents that her father had paid Kates $10,000 to marry her ($8000 in cash and $2000 representing loan forgiveness). She also began to prepare a written statement, but refused to complete it for fear of implicating her father. The agents permitted her to leave the airport.

On April 25, 2005, the INS agents went to Kates's residence to interview him. When they arrived at his address, another resident of the apartment complex permitted them to enter and showed them the room where Kates lived. There, the agents discovered Kates in bed with a woman who was not Dimitrova. Kates told the agents that he had been involved with this woman for more than two years, but he was still married to Dimitrova. He insisted that

---

[1] During the time period covered by this case, the Immigration and Naturalization Service was renamed Immigration and Customs Enforcement and absorbed into the Department of Homeland Security. For ease of reference, we use the older name "INS" to refer to the immigration authorities involved in this case.

[2] The district court excluded this note at trial on relevancy grounds.

Dimitrova's father had not paid him to marry her, but admitted that Dimitrova had never moved in with him.

Kates and Dimitrova were charged with one count of marriage fraud in violation of 8 U.S.C. § 1325 and one count of making false statements to the INS in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2. Prior to trial Dimitrova moved to exclude her statements and Kates's under *Bruton v. United States*, 391 U.S. 123 (1968). The district court resolved the *Bruton* problem by empaneling two juries and removing each defendant's jury from the courtroom when the other defendant's statements were introduced.

Trial before the dual juries proceeded in January 2006. In addition to the foregoing evidence, the government presented documents from the company that managed Kates's apartment complex establishing that he never informed the management company about his marriage to Dimitrova and never was issued more than one access card to the apartment complex. In addition, the government presented evidence from Dimitrova's former employer that her paycheck was sent to her parents' address and Dimitrova's mother was listed as her emergency contact. Also, further investigation had called into question the documentation Kates and Dimitrova submitted to the immigration official who first reviewed Dimitrova's adjustment application. For example, an Internal Revenue Service ("IRS") agent testified that the IRS did not have a 2002 joint tax return on file for the couple. Finally, an official with Match.com, an online dating service, testified that Dimitrova had opened an account in August 2000 describing herself as unmarried and interested in meeting someone between ages 21 and 30. The dating service's records established that Dimitrova updated her account on August 5, 2002 (a year after her marriage to Kates), but did not change her "never married" status, and had accessed her account and e-mailed other users a few times during the time she was married to Kates.

Dimitrova did not move before trial to suppress the statements she made to the INS agents at the airport. During trial, Dimitrova objected to the introduction of her airport statements with the following brief argument: "Judge, as this statement indicates, she requested to end the sworn statement, which means she asserted her Fifth Amendment right, and I think the jury shouldn't see it." This was an apparent reference to Dimitrova's refusal to complete her written statement for fear of implicating her father. The district court overruled the objection. Dimitrova's jury found her guilty of marriage fraud, but acquitted her on the charge of making a false statement to the INS.

After trial Dimitrova, now represented by new counsel, moved for acquittal or a new trial, arguing for the first time that her statements to the INS agents at the airport were unwarned and therefore inadmissible under *Miranda*. Dimitrova also challenged the sufficiency of the evidence, arguing that the evidence had not established the marriage was entered into fraudulently. The court denied the motion and imposed a term of probation.

## II. Analysis

On appeal, Dimitrova challenges the denial of her motion for a new trial, arguing that the

district court erred in admitting the statements she made to the INS agents at the airport, which she claims were custodial, lacked *Miranda* warnings, and were involuntary. She also claims the evidence was insufficient to support her conviction.

## A. Dimitrova Procedurally Defaulted her *Miranda* Claim

Dimitrova's *Miranda* challenge to the admissibility of her airport statements came too late; it was first raised in her posttrial motion. Rule 12(b)(3)(C) of the *Federal Rules of Criminal Procedure* requires that motions to suppress evidence be brought before trial; subsection (e) of Rule 12 says the failure to raise such a motion before trial is a waiver, but "[f]or good cause, the court may grant relief from the waiver." We have held that the "waiver" referenced in Rule 12(e) is really more akin to a forfeiture, which generally leaves room for the narrower scope of review permitted under the plain-error doctrine—but *only* if the defendant has satisfied Rule 12(e)'s "good cause" prerequisite for obtaining relief. *Johnson,* 415 F.3d at 730-31. Dimitrova has not done so.

Dimitrova has offered no cause or explanation for her failure to raise the suppression issue before trial. Instead, she argues that the objection her counsel made during trial was enough to preserve the *Miranda* issue for our review. We disagree. Her trial counsel's truncated objection claimed only that Dimitrova "asserted her Fifth Amendment right" when she refused to complete her written statement. Counsel made *no* reference to the admissibility of her statements more generally, nor did he make any objection based on *Miranda* in particular. Counsel did not argue that Dimitrova was in custody and entitled to *Miranda* warnings at the time of the airport interview; the record is silent about whether or not she received *Miranda* warnings. Dimitrova never claimed that her statements during the airport interview were involuntary. In short, nothing about the objection Dimitrova raised during trial substitutes for a proper pretrial suppression motion preserving the *Miranda* issue for review or demonstrating good cause for failing to do so.

Dimitrova did not offer a "good cause" explanation sufficient under Rule 12(e) and *Johnson* in her posttrial motion, nor has she done so on appeal. Accordingly, the issue is fully defaulted; under these circumstances, not even plain-error review is warranted.

## B. Sufficient Evidence Supports the Jury's Verdict

We review the denial of a motion for judgment of acquittal de novo. *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998). Under 8 U.S.C. § 1325(c), the government must prove that Dimitrova: (1) knowingly entered into marriage; (2) knowingly entered into marriage for the purpose of evading any provision of the immigration laws; and (3) knew or had reason to know that her conduct was unlawful. *United States v. Darif*, 446 F.3d 701, 709 (7th Cir. 2006).

An attack on the sufficiency of evidence is "a nearly insurmountable hurdle" on appeal. *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir. 1992). In order to prevail, Dimitrova must establish that no rational jury could have found her guilty on the evidence presented. *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006). We review the evidence in the light

most favorable to the government.  *Id.*

The evidence easily meets this standard.  The government presented evidence that Dimitrova married Kates just 29 days before her student visa was set to expire.  Kates never listed Dimitrova as a resident at his apartment and never obtained an access card for her for the apartment complex where she purportedly lived with him as husband and wife.  The IRS had no record of the 2002 joint tax return the couple presented to the INS in connection with Dimitrova's status-adjustment application.  Dimitrova maintained her Match.com account after her marriage to Kates, never altered her "never married" status on the account profile, and communicated with others using the online dating service during the time she was married to Kates.  Moreover, Dimitrova had her paycheck sent to her parents' house and listed her mother as her emergency contact for work.  Finally, Dimitrova admitted to INS agents in her airport interview that her father paid Kates $10,000 to marry her.

Dimitrova offered a number of innocent explanations for some of this evidence, but the jury was entitled to draw the contrary conclusion argued by the government.  The evidence was sufficient to establish that Dimitrova knowingly entered into a fraudulent marriage for the purpose of obtaining immigration benefits.

For the foregoing reasons, we AFFIRM the judgment of the district court.